J-S31023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RANDY ROOT | : | |
| | : | |
| Appellant | : | No. 2982 EDA 2023 |

Appeal from the Judgment of Sentence Entered June 15, 2023
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000478-2021

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED DECEMBER 2, 2024**

Randy Root appeals from the judgment of sentence entered following his convictions for attempted murder, aggravated assault, assault of a law enforcement officer, recklessly endangering another person, burglary, and two counts each of persons not to possess firearms and theft by unlawful taking or disposition.[1] Root challenges the sufficiency and the weight of the evidence and the discretionary aspects of his sentence. We affirm.

Prior to trial, Root filed a motion to introduce evidence of his drug use and mental state. The court denied the motion, and ruled that Root was not permitted to introduce any evidence of his drug use or its effect upon his mental state or ability to form specific intent.

_____

[1] **See** 18 Pa.C.S.A. §§ 901(a), 2502, 2702(a)(2), 2702.1(a)(1), 2705, 3502(a)(2), 6105(a)(1), and 3921(a), respectively.

The court summarized the pertinent facts presented at the bifurcated jury trial as follows.

On August 23, 2020, at approximately 12:12 p.m., Upper Gwynedd Township Police [Sergeant] Raymond Royds and [Officer] Minjoo Kim responded to 1317 East Prospect Avenue in North Wales, Pa[.] for a report of a suspicious person. The 911 caller who made this report indicated that a male, later identified as [Root], walked down his driveway and asked for water. The caller described that [Root] was wearing a white t-shirt and white shorts and was carrying a black backpack. The caller mentioned that he had never seen this individual before and the whole situation seemed very strange.

[Sergeant] Royds and [Officer] Kim located [Root] following their arrival at the scene. [Root] was wearing a white t-shirt and white shorts and was carrying a black pack. Officer Kim instructed [Root] to stop and wait on the sidewalk so they could speak. [Root] subsequently ran away from the officers and into an area named Roth Farms. When Officer Kim began to search around Roth Farms, a resident informed him that a male matching [Root]'s description had attempted to enter her vehicle and another resident indicated that an individual matching [Root]'s description had run behind homes on Cathys Lane. The officers also began to receive dispatches that a person matching [Root]'s description had been entering vehicles and backyard sheds in the neighborhood.

[Sergeant] Royds made his way to the vicinity of Cathys Lane upon receipt of this information and observed [Root], who proceeded to flee from the scene despite the officer's directive to stop. [Sergeant] Royds began a foot pursuit and observed that [Root] was no longer wearing a white shirt and was now dressed in a black shirt. [Sergeant] Royds eventually encountered [Root] in the back yard of the property located at 1457 Cathys Lane. [Root] proceeded to run directly towards the officer, raised a long black gun next to his hip and yelled, "Fuck you, you fucking nigger." [Root] subsequently fired a single shot in [Sergeant] Royd's direction from a distance of approximately ten (10) yards, but the officer was not hit. [Root] fled following this encounter and Officer Kim, who had responded to the scene and heard the gunshot, observed [Root] running in the vicinity of Cathys Lane. Officer Kim noted [Root] was wearing a black t-shirt, white shorts

and was carrying what appeared to be a long gun. Authorities eventually took [Root] into custody in the back of a property located at 1460 Cathys Lane. During the arrest, [Officer] Kim, [Sergeant] Royds and another officer observed a long gun on the ground in [Root]'s vicinity, later identified as a Mossberg 500 shotgun. While authorities were placing [Root] into custody, he called Officer Kim a "fucking gook" and referred to other police officers as "fucking pigs."

An examination of the Mossberg 500 shotgun recovered at the 1460 Cathys Lane arrest location revealed the chamber contained a fired shotgun shell. Authorities also recovered two (2) unfired shot shells from the arrest location and several of [Root]'s personal belongings, including his backpack. Authorities also discovered syringes and other drug paraphernalia at this location. Authorities later processed the shooting scene at 1457 Cathys Lane and recovered a single unfired shot shell, a High Point carbine rifle and a green scabbard.

Kenneth Piening, who lived in a property adjacent to the shooting location at 1457 Cathys Lane, indicated that he had planned to use his firearms at a shooting range on the day of the event. Towards this end, Mr. Piening retrieved and prepared three (3) firearms for transport to the range which involved removing any ammunition and placing the guns in travel cases. These firearms included a Mossberg 500 shotgun and a High Point carbine rifle. Before Mr. Piening was able to leave for the shooting range, he received a phone call directing him to go to work. Mr. Piening had been preparing the firearms in his dining room and inadvertently left them on the side of the dining room table. Mr. Piening indicated this table was located near a sliding glass door leading outside the residence, which he mistakenly left unlocked that day. Mr. Piening also stated that these firearms would have been visible from someone standing outside the residence and looking inside through the sliding glass door. Mr. Piening further indicated that when he removed the ammunition from the firearms in preparation for transport, he likely placed this ammunition on the dining room table or in a bag in the vicinity of the table.

When Mr. Piening returned home and did not see the firearms, he assumed he had put them away before leaving for work. Upon speaking with authorities the day following the shooting, Mr. Piening realized that he had not put the firearms away and the Mossburg 500 shotgun and High Point carbine rifle

had been stolen. Mr. Piening confirmed that the shells recovered at the 1460 Cathys Lane arrest location and at the 1457 Cathys Lane shooting location were consistent with the type of ammunition he would use in his Mossberg 500 shotgun. Mr. Piening further confirmed that the fired shotgun shell casing located in the Mossberg 500 shotgun was consistent with the type of ammunition he possessed.

\*\*\*

During a recorded prison phone call between [Root] and his mother, when his mother mentioned that [Root] was being accused of shooting at a police officer, [Root] responded, "[S]o?" and did not make any effort to indicate to his mother that he was not shooting at [Sergeant] Royds. In another recorded prison phone call between [Root] and an unidentified female, [Root] stated, "[H]e was right in front of me. Like literally, 10 feet in front of me you know what I mean? But like he was – it was fucking black truck and it was a Chinese fucking dude in street clothes. It wasn't a cop, you know what I mean? Like I didn't shoot at a fucking cop, I shot at a fucking man, you know what I mean? Like a fucking man in street clothes and a fucking Chinese du[d]e that was fucking chasing me like yeah that's what I think happened you know what I mean? But like yeah it was so fucking crazy."

Trial Court Opinion, filed March 28, 2024, at 1-3, 23 (citations to N.T. omitted, emphasis omitted).

At the conclusion of trial, the court charged the jury on the above-listed offenses, save the two counts of persons not to possess firearms. The court instructed the jury that voluntary intoxication is not a defense to attempted murder. It also asked the jury to decide, on a special interrogatory, whether Root had possessed one loaded firearm and one unloaded firearm. The jury found Root guilty on all counts. It also found that Root had possessed the firearms. The Commonwealth then presented evidence of Root's prior felony

convictions. The jury thereafter additionally convicted Root of two counts of persons not to possess firearms.

At Root's sentencing hearing, the court stated it had considered the information contained in the presentence investigation report ("PSI"). N.T., 6/15/23, at 7. The defense argued for leniency on the basis that Root's parents "struggled with alcohol addiction and engaged in domestic violence during [Root's] childhood." Trial Ct. Op. at 15. Root's counsel also "referenced [Root]'s drug use, including his abuse of methamphetamine." *Id.*

The court sentenced Root to the mandatory minimum of 20 to 40 years' incarceration for assault of a law enforcement officer, and a consecutive 8½ to 17 years' incarceration for persons not to possess firearms, which the court noted was a standard-range sentence. It also imposed two consecutive terms of 4 years, 3 months to 8½ years in prison for the two counts of theft by unlawful taking, which the court noted were also standard-range sentences. The court found all other convictions merged. The aggregate sentence was 37 to 74 years' incarceration. Root filed a post-sentence motion, which the court denied.[2]

Root appealed. He raises the following issues:

1. Whether the jury erred in finding [Root] guilty of Count 1 Attempted Murder where the evidence presented at was insufficient to warrant a conviction.

_____

[2] Root filed his post-sentence motion *nunc pro tunc* by leave of the court.

2. Whether the jury erred in finding [Root] guilty of Count 1 Attempted Murder where verdict was against the weight of the evidence presented at trial.

3. Whether the Sentencing Court abused its discretion in [Root's] Motion to Reconsider Sentence and sentencing [Root] to 37 to 74 years' incarceration was unduly harsh, excessive and unreasonable.

Root's Br. at 8.

Root first argues the evidence was insufficient to establish that he shot at Sergeant Royds intending to kill him. Root points out that his shot did not hit Sergeant Royds, even though he was only 10 yards away. He asserts Sergeant Royds testified that he did not see the actual shot. Furthermore, Root argues the evidence reflects he fired the shotgun from his hip, rather than his shoulder, which Sergeant Royds testified "causes the loss of stability and accuracy." *Id.* at 26. Root also argues the fact that there was a "balloon and [needles] found at the scene show[s] this was a drug induced act." *Id.* at 27. He asserts the foregoing evidence demonstrates that he "did not care about the accuracy of his shot," and therefore "did not have the specific intent to kill Sergeant Royds." *Id.*

The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." *Commonwealth v. Mikitiuk*, 213 A.3d 290, 300 (Pa.Super. 2019). The resolution of this question requires the following analysis.

When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt."

- 6 -

> *Commonwealth v. Feliciano*, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." *Id.* (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. *Commonwealth v. Patterson*, 180 A.3d 1217, 1229 (Pa.Super. 2018). In conducting this analysis, we may not substitute our judgment for that of the factfinder. *Id.* at 1230. Additionally, the Commonwealth's evidence "need not preclude every possibility of innocence." *Feliciano*, 67 A.3d at 23 (citation omitted). The factfinder is free to believe all, part, or none of the evidence. *Id.*

*Commonwealth v. Griffith*, 305 A.3d 573, 576-77 (Pa.Super. 2023), *appeal denied*, 319 A.3d 503 (Pa. 2024).

"A conviction for attempted murder requires the Commonwealth to prove beyond a reasonable doubt that the defendant had the specific intent to kill and took a substantial step towards that goal." *Commonwealth v. Blakeney*, 946 A.2d 645, 652 (Pa. 2008); *see also* 18 Pa.C.S.A. § 901(a) (Attempt); 18 Pa.C.S.A. § 2502 (Murder).

Root challenges only the evidence that he had the specific intent to kill Sergeant Royds. Like any other element, a defendant's specific intent can be proven by direct or circumstantial evidence. *See Blakeney*, 946 A.2d at 651. The discharging of a firearm towards a person may establish specific intent beyond a reasonable doubt, even if none of the bullets strike a vital part of the victim's body or the defendant misses the victim altogether. *Commonwealth v. Manley*, 985 A.2d 256, 272 (Pa.Super. 2009); *see Commonwealth v. Cross*, 331 A.2d 813, 814 (Pa.Super. 1974) ("The offense of attempt with intent to kill is completed by the discharging of a firearm at a

person with intent to kill, despite the fortuitous circumstances that no injury is suffered").

Root will not be heard to argue that the evidence of his voluntary drug use negated his specific intent to commit first-degree murder. The court ruled that voluntary intoxication is not a defense to attempted murder. *See Commonwealth v. Williams*, 730 A.2d 507, 511 (Pa.Super. 1999). Root does not challenge that ruling in this appeal, and may not revive this issue on appeal.

Regarding the remainder of Root's argument, the trial court found the evidence sufficient because

> [Root] fired a shotgun in [Sergeant] Royds' direction when he was at a distance of approximately ten (10) yards and yelled an obscenity at the officer while engaging in this act. In two (2) recorded phone calls, [Root] admits he shot in the direction of the officer and does not make any claim that he was simply trying to scare the officer by consciously firing in a direction so as to avoid his vital organs. Although [Sergeant] Royds was not struck by the shot, this fortuitous result was not any indication that [Root] simply intended to scare the officer and did not serve as a basis to negate [Root]'s specific intent to kill.

Trial Ct. Op. at 24 (citations omitted).

We draw the same conclusion. The testimony establishes that Root ran "directly at" Sergeant Royds and stopped when he was 10 yards away, pointing his firearm at Sergeant Royds. N.T., 2/22/23, at 219-21. Root yelled a racial slur at Sergeant Royds and then discharged the firearm. *Id.* at 223, 243. Sergeant Royds did not recall "actually seeing the shot," because he was "in the midst of turning around" to take cover. *Id.* at 243. However, Root later

admitted during a recorded phone call that he "shot at a fucking man." N.T., 2/23/23, at 83-84; Exs. C-45, C-46. This evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove that Root had the specific intent to kill Sergeant Royds when he fired his weapon. The fact that Root did not hold the gun properly and failed to hit Sergeant Royds does not negate the other evidence of intent.

Root next argues the verdict was against the weight of the evidence. According to Root, "The fact that Sergeant Royds did not see the direction of the shot fired at him, that he was not injured and the gun was fired from [Root]'s hip should have led the jury to conclude there was no specific intent to kill." Root's Br. at 28. Root further claims, "[T]he discovery of a balloon commonly used for storing drugs plus needles lead[s] on[e] to conclude that this was a mental health emergency and not an attempt to kill Sergeant Royds." *Id.* at 28-29.

"We review a trial court's order denying a weight challenge for an abuse of discretion." *Commonwealth v. Fallon*, 275 A.3d 1099, 1107 (Pa.Super. 2022). Because the trial court heard the testimony first hand, we must "give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Id.*

In deciding whether the verdict was against the weight of the evidence, the trial court must determine if "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal

weight with all the facts is to deny justice." *Id.* (citation omitted). "Courts have stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Id.* (cleaned up).

Here, in denying the weight claim, the court found,

[T]he evidence demonstrated [Root] had the specific intent to kill [Sergeant] Royds and took a substantial step towards that goal. The Commonwealth presented evidence indicating [Root]'s actions on the day of the shooting, including his attempts to elude law enforcement which involved his changing of t-shirts, taking firearms from Mr. Piening's home and firing a shotgun at [Sergeant] Royds at close range while yelling obscenities at the officer. The Commonwealth also presented evidence of [Root]'s recorded phone calls with family members and others in which he admitted that he shot at [Sergeant] Royds.

The factors [Root] raises with respect to his weight claim are simply items which the jury chose not to assign significant (if any) weight. [Root]'s act of firing only one shot while shooting from his hip without aiming and ultimately not hitting [Sergeant] Royds did not compel the conclusion that [Root] possessed no specific intent to kill the officer. The jury chose to assign the requisite amount of weight to these factors and still found that the totality of the evidence surrounding the shooting established that [Root] had the specific intent to kill [Sergeant] Royds and took a substantial step towards that goal.

The record demonstrates the evidence introduced by the Commonwealth, fully supported the jury's verdict. Therefore, the verdict was not so contrary to the weight of the evidence such that it shocks one's sense of justice.

Trial Ct. Op. at 26.

The court did not abuse its discretion in denying the weight claim. The evidence Root points to does not so clearly contradict the evidence that he

- 10 -

intended to kill Sergeant Royds as to render the rejection of the claim an abuse of discretion.

Root's final argument is that his sentence was unduly harsh, excessive, and unreasonable. This goes to the discretionary aspects of his sentence. As such, we must first determine whether Root's Rule 2119(f) statement raises a substantial question that the sentence is inappropriate under the Sentencing Code. **Commonwealth v. Snyder**, 289 A.3d 1121, 1126 (Pa.Super. 2023); Pa.R.A.P. 2119(f).[3] "A substantial question exists when the appellant makes a colorable argument that the sentencing judge's actions were either inconsistent with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process." **Snyder**, 289 A.3d at 1126.

In his Rule 2119(f) statement, Root argues the court "imposed a sentence that is grossly disproportionate to his crimes and failed to consider his background or nature of offenses and provide adequate reasons on the record for the sentence." Root's Br. at 24. This raises a substantial question. **See Commonwealth v. Brown**, 249 A.3d 1206, 1211 (Pa.Super. 2021) ("finding a substantial question where appellant averred trial court failed to consider certain sentencing factors in conjunction with an assertion that the sentence imposed was excessive") (citing **Commonwealth v. Hill**, 210 A.3d

---

[3] Root met the other prerequisites to our entertaining such a claim by filing a timely notice of appeal and preserving the claim in a post-sentence motion. **See Snyder**, 289 A.3d at 1126.

1104, 1116 (Pa.Super. 2019); *Commonwealth v. Flowers*, 149 A.3d 867, 871 (Pa.Super. 2016) ("[a]ppellant has raised a substantial question for our review by asserting that the trial court failed to state adequate reasons on the record for [a]ppellant's sentence").

We therefore turn to the merits of Root's argument, guided by the following precepts. In imposing a sentence of total confinement, the court must consider the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. 42 Pa.C.S.A. § 9721(b); *see also id.* at § 9725 (stating the necessary considerations and available reasons for the imposition of total confinement). The court must also consider the minimum sentence ranges suggested by the sentencing guidelines. *Id.* at § 9721(b). Furthermore, the court must state its reasons for the sentence at the time of sentencing. *Id.* However, "[w]here the court has the benefit of a PSI report, we presume the court was aware of all appropriate sentencing factors and considerations and consider the requirement that the court place its reasoning on the record to be satisfied." *Snyder*, 289 A.3d at 1126.

This Court will vacate a trial court's sentence that falls within the guidelines' ranges only "where the application of the guidelines would be clearly unreasonable." 42 Pa.C.S.A. § 9781(c)(2). When reviewing the record, we consider

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

*Id.* at § 9781(d). Our review of these factors, however, does not replace the judgment of the trial court. **Snyder**, 289 A.3d at 1126-27. Rather, "[s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." **Id.** at 1126 (citation omitted).

Root argues his sentence of 37 to 74 years was disproportionate to his crime because he "was likely high on drugs at the time of the incident" and "no one was physically injured in this matter." Root's Br. at 33. He also argues that it is unduly harsh because it fails to account for his and his parents' history of drug and alcohol abuse. **Id.**

Here, the court reviewed the PSI report. It also heard defense counsel's argument regarding Root's upbringing and drug addiction. Thus, the transcript of the sentencing hearing belies Root's assertion that the court failed to consider these factors.

The court also gave adequate reasons for the sentence it imposed. Prior to imposing sentence, the trial court stated the following:

> At the conclusion of the trial, the jury issued their verdict, finding, among other things, you were guilty of attempted first-degree murder.
>
> First, the jury found that you fired a weapon at Sergeant Royds.
>
> Second, the jury found you had the specific intent to kill Sergeant Royds and that you knew what you were doing.

Police are at risk on a daily basis. This comes with the job. However, it is not acceptable behavior, nor can it ever be tolerated, that someone would intentionally point a weapon at an officer and attempt to kill that officer.

You intended to kill [Sergeant] Royds, and you have shown no remorse in your conduct. I expect that if you have any regret, it is that you did not kill him or physically harm him or that you were caught.

You point to your drug use as an excuse. You knew exactly what you were doing, which is evidenced by your conduct that day and your subsequent prison calls.

That day you consciously put everything into motion. You were trespassing where you should not have been. You intentionally went into someone's house to steal weapons knowing you were a person not to possess.

When police arrived, you fled from police as a sign of your consciousness of guilt regarding your burglary and theft of weapons. That in and of itself would be egregious conduct.

However, your conduct did not stop there. You then put many police officers at risk when you fled. Being in possession of weapons, you also put the public at risk.

When finally being cornered by police and to avoid apprehension, you pointed a weapon at Sergeant Royds [and] fired it with the intent to kill him. Only by your misuse of that weapon and/or . . . luck or someone looking out for Sergeant Royds did you not kill him or seriously injure him. That is not a mitigating factor.

Sergeant Royds has suffered and will likely continue to suffer irreparable harm as a result of your conduct. It has affected his ability to serve as a police officer and may forever impact him.

You pose a current and continued danger to the public. My sentence takes into account your egregious conduct and the need to protect the public.

I have discretion to sentence you in the mitigated range. To do so, I would have to find there are mitigating factors. Under these circumstances, I cannot find any mitigating factors, nor can I justify any sentence in [the] mitigated range.

N.T., 6/15/23, at 17-20.

In its opinion, the court further explains,

[Root] is a violent offender who attempted to kill a police officer working in the line of duty. Immediately prior to this act, [Root] entered into a residence and stole two (2) firearms despite being a convicted felon who was not permitted to be in possession of any firearms. [Root] demonstrated minimal concern for his actions during a recorded prison phone call between himself and his mother in which [Root]'s mother stated how he was being accused of shooting at an officer and [Root] responded, "[S]o?" [Root]'s actions caused [Sergeant] Royds to suffer from debilitating anxiety which necessitated therapy and eventually resulted in him not being able to serve in law enforcement.

Trial Ct. Op. at 15-16 (citations to N.T. omitted).

The court did not abuse its discretion. Root's sentence – composed of a mandatory minimum and three consecutive, standard-range sentences – is not clearly unreasonable given his conduct, his lack of remorse, and the effect of the crime on the victim.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2024

- 15 -